**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

LESLIE ANDERSON,             )
                                    )
          Plaintiff,         )
                                    )
          v.                )     Case No. 09-CV-0575-NKL
                                    )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,   )
                                    )
          Defendant.      )

**ORDER**

Plaintiff Leslie Anderson ("Anderson") challenges the Social Security Commissioner's ("Commissioner") denial of her claim of disability and disability insurance benefits. This lawsuit involves an application for disability insurance benefits, and supplemental security income benefits, under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433.

Anderson's initial application was denied, and she appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing, the ALJ found that Anderson was not "disabled" as that term is defined in the Act. The Appeals Council denied Anderson's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Anderson argues that the ALJ erred by (1) finding that Anderson's impairments did

1

not meet the requirements of listing § 12.04 or 12.06; (2) failing to afford controlling weight to Anderson's treating psychiatrist; and (3) improperly formulating Anderson's Residual Functional Capacity ("RFC"). The Court finds that if the ALJ had given proper controlling weight to Anderson's treating psychiatrist, then Anderson's impairments would have met the requirements of listing § 12.04 or 12.06 and her RFC would have resulted in a finding of disability. As a result, the Court finds that the ALJ's decision was not supported by substantial evidence on the record as a whole, and the Court remands for an award of benefits.

## I.     Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the hearing before an ALJ, Anderson testified as well as Anderson's personal care assistant, Patricia Greer, and a vocational expert, Marianne Lumpe. No medical testimony was received. At the time of the hearing, Anderson was forty-four years old with an associate's degree in accounting. Anderson's prior work included a communications representative, accounting clerk, administrative assistant, assistant bookkeeper, auditor, clerk, office manager, recruiter, tax examiner, and waitress. Anderson alleges in her disability report she became disabled on October 14, 2004, due to depression, hyperthyroid disease, and high blood pressure. However, as the ALJ noted, several other disorders were found to be severe impairments, including an anxiety

---

[1] Portions of the parties' briefs are adopted without quotation designated.

disorder, degenerative disc and joint disease, insulin-dependant diabetes, asthma, and weight disproportionate to height. In support of these claims, Anderson submitted medical records from multiple doctors.

## A. Medical Records

Anderson's medical records are extensive and were thoroughly briefed by both parties in this case and will not be repeated in this Order. With regard to her physical impairments, Anderson has treated for numerous impairments, including hyperthyroidism, hyperlipidemia, irritable bowel syndrome, atypical chest pain, degenerative disc disease, thoracic spine pain, diabetes, gastro esophageal reflux disease, and chronic headaches. With regard to her mental impairments, Anderson has been diagnosed with a major depressive disorder, panic disorder, anxiety, and an adjustment disorder.

### 1. Truman Medical Center

Anderson presented to Truman Medical Center ("TMC") on May 24, 2004. Rick Zbinden, MSW/LCSW, filled out an intake assessment and noted that Anderson was "very invested in receiving Ativan over all other treatment options," and that it was unclear whether Anderson was malingering or medication seeking. (Transcript "Tr." 164). Zbinden noted inconsistencies between Anderson's presentation and her reported symptoms, and he questioned whether Anderson over reported her symptoms in "her quest to diagnose herself." (Tr. 164). He assessed a current global assessment of functioning ("GAF") score of 57.[2]

---

[2]A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* American

Zbinden indicated on the form that Anderson's highest GAF in the last year was a 62,[3] but there was no indication how that opinion was formed because Zbinden only completed a one-time intake assessment summary. Moreover, there was no place on the form to record the lowest GAF in the last year.

Anderson next presented to TMC on November 8, 2004, stating that she believed she had sleep apnea. She reported a history of loud snoring, daytime sleepiness, and a sensation that she is going to choke at night. Anderson further reported that she was on Prozac for depression, and felt she needed to see a psychiatrist.

On January 9, 2005, Anderson was admitted to TMC with a three-day history of chest pains and upper extremity numbness. She reported that she experienced numbness in her left arm and then her arm went completely limp. Anderson's pain resolved following six doses of nitroglycerin. She further reported daytime sleepiness and daily headaches. She was discharged the following day with directions to return to the emergency department if she developed further chest pain. Six days later, on January 15, 2005, Anderson again presented to TMC with complaints of substernal chest pain which had been going on for several days. Anderson noted that her chest pain was aggravated by breathing and that she felt her symptoms were from sleep apnea. Testing was positive for cannabis. She was discharged

Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000) (DSM-IV-TR).

[3]A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See* DSM-IV-TR at 34.

on January 17 with the following diagnoses: non-cardiac chest pain, unspecific anxiety disorder, and abdominal pain. When she was discharged, David Wooldridge, M.D., noted that Anderson was requesting more Ativan, an anti-anxiety medication, despite the fact she was given a 30-day supply 10 days earlier. He declined to prescribe additional anti-anxiety medication, and instead wrote a prescription for ibuprofen.

On January 27, 2005, Anderson presented with complaints of severe anxiety attacks. She described her attacks as "feeling like I'm having a heart attack," with associated shortness of breath, racing heart, and left side numbness. Anderson attributed anxiety attacks to immense stress in her life including the facts that she was jobless, homeless, and had to care for a special needs child. Anderson was diagnosed with a severe anxiety disorder and depression.

On March 17, 2005, Anderson presented to TMC for an endocrine consultation. She was diagnosed with hyperthyroidism, hyperlipidemia, depression, anxiety, and irritable bowel syndrome. It was noted that both Anderson's depression and irritable bowel syndrome were exacerbated by her hyperthyroid condition.

Anderson was again admitted on April 5, 2005, after developing sharp substernal chest pain. Anderson was diagnosed with atypical chest pain, likely related to anxiety; hyperthyroidism; anxiety/depression; irritable bowel syndrome; dyslipidemia; and hypokalemia.

Anderson presented to the emergency room on June 24, 2005, reporting chest pain. She described the pain as left-sided pressure pain with radiation to her left arm and shoulder.

Anderson reported a 20 pound weight gain. She further noted that she felt her depression was worsening and she had recently started to experience edema in her lower extremities and hands. Anderson received the following diagnoses: atypical chest pain, severe hypothyroidism, hypertension, and hyperlipidemia. Three days later, on June 27, 2005, Anderson returned to the emergency room with chest pains on the right side of her chest Following evaluation, it was noted that Anderson was positive for general fatigue, diffuse muscular pain, chest pain, and occasional shortness of breath.

The following month, on July 13, 2005, Anderson returned for a follow-up regarding her hypertension, anxiety, depression, and hypothyroidism. She continued to complain of fatigue, dry skin, cold intolerance, and occasional anxiety attacks.

On August 9, 2005, Anderson had an endocrinology follow-up. She complained of severe fatigue, constipation, being cold all the time, weakness, myalgia, muscle cramps, weight gain, and dry skin. She was diagnosed with hypothyroidism, hyperlipidemia, hypertension, depression, anxiety, and irritable bowel syndrome.

### 2. Western Missouri Mental Health Center

Anderson presented to Western Missouri Mental Health Center on February 1, 2005 with complaints of anxiety and depression, increased blood pressure, and difficulty breathing. She reported that she had been depressed since the previous October. Following a mental status examination, it was noted that Anderson's mood was depressed and anxious with a blunted affect. Anderson's psychiatric illness was described as moderate. She was alert, fully oriented, attentive, and her memory was intact. She had "moderate" depressed mood,

blunted affect, anxious mood, and somatic concerns. Anderson was given a GAF score of 55. She was diagnosed with an adjustment disorder, depression, not otherwise specified (NOS), and an anxiety disorder.

### 3.    Swope Parkway Health Services

Anderson presented to Swope Parkway Health Services ("Swope") on October 12, 2005, for an initial interview. She reported that she experiences daily panic attacks and depression. Anderson noted other symptoms to include: weight fluctuation, difficulties sleeping, crying spells, fatigue, and concentration difficulties. She reported that she feels afraid and detached, and has approximately three panic attacks a day. Anderson further noted that she avoids driving on the highway because this causes extreme anxiety. She also reported that she was sexually abused by her step-father when she was seven years old. Anderson was diagnosed with a panic disorder without agoraphobia and a major depressive disorder, recurrent, moderate. She was assigned a GAF of 35 and referred to individual therapy.

The following day, Anderson met with Psychiatrist James True, M.D. Dr. True opined that Anderson's overwhelming problem has been her difficult to treat thyroid condition. He further described Anderson as somewhat volatile with an over-reactive style of dealing with problems. Anderson reported that her main problem is her thoughts causing her to be "hyper alert." Dr. True noted that Anderson gave a great deal of detail and opined that there was no histrionic presentation or hysterics. Her mood was depressed with a sad affect. Dr. True diagnosed Anderson with a Panic Disorder without Agoraphobia and a

Major Depressive Disorder and assigned a GAF of 50.[4] He further opined that Anderson was disabled from her thyroid, heart, and emotional illness. He indicated that she should remain off work for at least three months.

On September 21, 2006, Dr. True completed a mental residual functional capacity form assessing Anderson's work-related limitations. Dr. True noted Anderson's symptoms to include: sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, psychomotor agitation, difficulty thinking and concentrating, social withdrawal, decreased energy, manic syndrome, intrusive recollection of a traumatic experience, hostility and irritability. Dr. True opined that Anderson would have difficulty working at a job on a sustained basis because of her severe anxiety. He further opined that Anderson's psychiatric condition exacerbates her pain, noting that she worries excessively over small details.

Regarding functional limitations, Dr. True opined that Anderson had moderate restrictions in activities of daily living, marked restrictions in maintaining social functioning, marked deficits of concentration, persistence, or pace and; repeated episodes of deterioration or decompensation in work-like settings. Moreover, Dr. True felt that Anderson would likely miss more than four days of work per month as a result of her impairments.

On January 9, 2007, Anderson continued to report extreme anxiety and depression. She noted that she does not want to leave her house, because she feels anxious around others

---

[4]A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* DSM-IV-TR at 43.

and in public. Anderson described other symptoms to include restlessness, difficulty sleeping, and hopelessness. She was diagnosed with a Generalized Anxiety Disorder and Major Depressive Disorder.

Dr. True's opinion remained the same in a July 2008 mental residual functional capacity form. He noted that Anderson's symptoms included: poor memory, appetite disturbance, sleep disturbance, emotional lability, recurrent panic attacks, difficulty concentrating, and decreased energy. Dr. True assigned a current GAF of 47, with the highest over the past year a 49. He continued to opine that Anderson would have difficulty working on a sustained basis because of her persistent severe anxiety. He further opined that Anderson's anxiety related disorder results in a complete inability to function independently outside the area of the patient's home.

### 4. Kansas City Neurosurgery Group

Anderson presented to Jennifer Elliott, M.D., on April 9, 2007, for a follow-up after an inpatient hospitalization with severe headaches. She was diagnosed with myofascial components and occipital headaches. She was treated with trigger point and occipital nerve blocks. It was also noted that Anderson has significant cervical spine degeneration with marked spinal stenosis and cervical myelomalacia.

The following month on May 11, 2007, Anderson was evaluated by Neurologist Eric Flores, M.D. Anderson reported that her headaches had increased over the past year and were occurring on a constant basis, worsening throughout the day. An April 14, 2007, MRI revealed degenerative change. Dr. Flores opined that Anderson's cervical stenosis was

significant.  He opined that it was reasonable to do an anterior cervical discectomy and fusion.  The procedure was performed on June 20, 2007.

On December 28, 2007, Anderson returned for follow-up visit.  She reported extreme pain in her upper and lower extremities with discomfort, numbness, and loss of sensation.  Dr. Flores ordered an EMG nerve conduction study and referred Anderson to pain management.

On February 27, 2008, John Sands, M.D., performed a nerve conduction study.  Dr. Sands noted that the study revealed a minimally reduced voluntary interference pattern, opining that Anderson's symptoms are related to her long-standing right radiculopathy.

### 5.    St. Luke's Hospital

Anderson presented to St. Luke's Hospital on January 25, 2006, with a history of hyperthyroidism status post ablation.  She reported that she was experiencing bilateral wrist pain, primarily on her right, following an altercation with security at TMC.  Anderson also noted fatigue, weight gain, confusion, weakness, and constipation.  Following examination, it was noted that Anderson's lower extremities showed trace edema and a slight amount of swelling was noted in her right wrist.

The following week, Anderson returned to St. Luke's for a follow-up.  She also reported continued bilateral lower back discomfort especially with deep inspiration.  Anderson's diagnoses included hypothyroidism, hypertension, anxiety, thoracic spine pain, and bilateral wrist pain.

Anderson presented on February 22, 2006, because of low back pain following a

lifting injury two days earlier. An examination of Anderson's lower back revealed some right paravertebral muscle spasms. It was noted that Anderson also had hand swelling, lower extremity edema, and questionable periorbital edema.

On March 1, 2006, Anderson complained of increased symptoms of irritable bowel syndrome with nausea, vomiting, diarrhea, and cramps. She presented very tearful, noting that her anxiety symptoms had dramatically increased. The following month, Anderson presented with persisting lethargy, upper eyelid swelling, and weight gain. She reported other symptoms to include blurry vision, intermittent chest pains, and chronic pains in her upper and lower extremities.

On August 29, 2006, Anderson returned for a follow-up visit reporting continuing chest pains over the past several weeks. She was diagnosed with sinus congestion, non-cardiac chest pain, chronic back pain, and hypertension.

Anderson continued to report shortness of breath and chest pains on September 13, 2006. She reported that her symptoms increase with ambulation. Anderson also noted that she continues to have problems with anxiety and depression.

The following week Anderson presented to the emergency room following a psychotic episode. She also complained of myalgia occurring in her arms, legs, back, and chest wall. Following examination it was noted that Anderson experienced diffuse pain with touching in all muscle groups throughout the body.

On October 11, 2006, Anderson presented complaining about increased weight gain, gaining eight pounds since her last visit and twenty-four pounds over the last three months.

She also reported other symptoms of nausea, vomiting, constipation, diarrhea, and shortness of breath. Anderson's thyroid medication was increased.

Anderson was referred for evaluation of dyspnea on October 17, 2006. She reported dyspnea on exertion, specifically when walking a half block or climbing a flight of stairs. Anderson also has a history of sleep apnea, noting occasionally waking up gasping for air. Three days later, Anderson returned to the urgent care clinic with retrosternal sharp chest pain. After reviewing all prior tests, Sara Gardner, M.D., ordered a nuclear stress test which did not show any new changes.

On January 3, 2007, Anderson presented for follow-up on multiple conditions including gastro esophageal reflux disease, hypertension, hypokalemia, and asthma. She reported that she has not felt quite right since she was diagnosed with a thyroid disorder two years prior.

On March 13, 2007, Anderson came in reporting a three day history of a headache. She described the pain as a sharp pain that comes and goes. A CT scan revealed a pineal cyst. A March 15 MRI of Anderson's cervical spine revealed marked degenerative disc disease. The following day, Anderson underwent a right greater occipital nerve block and trigger point injections.

Anderson returned to St. Luke's on April 4, 2007, following her hospitalization for severe headaches secondary to cervical spinal stenosis. Anderson noted symptoms to include fatigue, occasional nausea, constipation, epigastric pain, headache, and neck pain. Lamont Weide, M.D., diagnosed Anderson with type 2 diabetes with neuropathy, hypothyroidism,

hypertension, cervical spinal stenosis, chronic headaches, depression, anxiety, irritable bowel syndrome, and asthma.

On July 11, 2007, Anderson returned to St. Luke's for a follow-up after being discharged the prior day. She continued to report difficulties with chronic headaches, describing a band-like pain that throbs most of the time.

In November 2007, Anderson was again evaluated for her chronic headaches. She reported that she was experiencing pain in multiple points on her head along with tender point tenderness. The following month, Anderson reported that her headache had resolved. On February 22, 2008, Anderson presented reporting chronic muscle spasms. She stated that she is unable to exert herself and complained of a constant ache that affects her entire body.

The following month, on March 14, 2008, Anderson was admitted with complaints of chest pain. Psychiatry was consulted to further evaluate Anderson's anxiety and depression. Anderson described a lifelong history of depression with worsening symptoms since 2005. She also reported experiencing significant anxiety attacks. Following a mental status examination, it was noted that Anderson presented depressed and tearful with a restricted affect. She was sedated at times during the evaluation, but able to carry on conversations with some difficulty. Anderson was diagnosed with Major Depressive Disorder, recurrent, moderate with psychotic features, and assigned a GAF of 55.

On July 9, 2008, Anderson presented with chest pain described as retrosternal, sharp in nature, non-radiating, and rated at a seven on a ten point scale. She also complained of a continuing headache. Anderson was admitted to telemetry for further work-up. Anderson

was discharged the following day.

### 6. Consultive Examinations

The record includes reports of two consultative examinations. A consultative examination was performed by John Keough, M.A., on February 9, 2006, at the request of Disability Determination Services ("DDS"). Anderson reported that she cannot handle stress, especially trauma, and gets confused doing things. She noted other symptoms to include: difficulty expressing herself, fear outside her comfort zone, high blood pressure, depression, decreased appetite, no energy, uncontrollable crying spells, trouble getting along with others, and feelings of hopelessness.

Following a mental status examination, Keough reported that Anderson presented very dramatic and somewhat histrionic. He further opined that Anderson suffered from mild to moderate depression. Keough opined that Anderson had minimal insight into her problems and a decreased quality of thinking. Intellectually, Keough opined that Anderson appeared to be functioning in the borderline range.

Keough opined that Anderson was experiencing a mild impairment in the following: ability to sustain concentration, persistence, and pace; ability to adapt to the environment of others; ability to adjust to changes in routine; and the ability to interact appropriately in social situations. He diagnosed her with an Anxiety Disorder and a Mood Disorder with indications of borderline intellectual functioning and a secondary diagnosis of a Personality Disorder.

On April 12, 2008, Anderson was examined by Angela Garner, M.D. Anderson

14

reported that she had an ablation secondary to her hyperthyroidism in March 2005 and since that time her "entire body has gone haywire." (Tr. 353). On physical examination, Dr. Garner noted that Anderson was moderately obese, weighing 220 pounds at 5 foot 6 inches tall. Dr. Garner further noted that Anderson cried through much of the examination and needed frequent refocusing. Dr. Garner also noted Anderson was "slightly histrionic" and also acted like she was about to fall in a manner that was "dramatic and purposeful." Dr. Garner also noted that Anderson began crying as soon as she sat down in the exam room, yet had been laughing with her companion and talking on the phone in the waiting room. Dr. Garner concluded that based on the "very limited" physical findings, any impairment in employment was psychiatric in nature.

Dr. Garner noted the following diagnoses: diabetes mellitus, type 2, insulin dependent; hypertension, hypothyroidism; severe depression; mild intermittent asthma; insomnia; anxiety disorder; persistent tobacco abuse; and degenerative joint disease of the spine. She further opined that she felt Anderson's impairments were psychiatric in nature.

### 7.    Missouri Department of Social Services

On December 13, 2005, an administrative hearing was held to determine Anderson's eligibility for Medical Assistance. It was noted that Anderson was diagnosed with hyperthyroidism in March 2005, resulting in an iodine radiation treatment. The procedure caused Anderson's condition to change into hypothyroidism. Her symptoms include daily muscle aches, constant pain in her left arm, and frequent cramping and swelling in her wrists and hands. Anderson has also been diagnosed with recurrent and moderate major depression

and generalized anxiety disorder. It was noted that despite taking medications, Anderson continues to experience frequent panic attacks, episodes of confusion, and memory problems. It was found that due to Anderson's physical and mental impairments, she would not be able to return to her past work or engage in any other substantial gainful activity.

Anderson participated in another Medicaid hearing on June 5, 2007. At the time of the hearing, Anderson's impairments were noted to include: anxiety, depression, hypertension, hypothyroidism, irritable bowel syndrome, marked degenerative joint disease, myofascial pain syndrome, chronic low back pain, asthma, chronic headache, diabetes mellitus, and Chiari I malformation. It was further noted that Anderson had been treated numerous times within the past year at hospital emergency rooms, and had undergone a cervical fusion, as well as nerve block and trigger injections. The Agency determined that Anderson's condition had not substantially improved and she continued to be permanently and totally disabled.

### B.   Anderson's Testimony

On June 23, 2008, Anderson testified before the ALJ. Anderson testified that she could not work because of various disorders including both physical and mental impairments. Anderson lives with her 15-year-old cousin whom she legally adopted because the child's mother was a drug addict. Anderson testified she had a cervical fusion performed because of a slipped disc. She testified that she began suffering from severe headaches, leading to the fusion. Since her surgery, Anderson has limited range of neck motion and occasionally drops things because of difficulties with her hands. She further testified that she has gained

50 pounds since being diagnosed with hyperthyroidism, weighing 212 pounds at the time of hearing. She is 5 feet 7 inches tall. Anderson was diagnosed with diabetes in March of 2007 and is insulin dependent.

Anderson also testified that she has numbness and pain in her arms and legs. She is not able to button her clothes and often drops objects. She has difficulties lifting anything heavier than two to three pounds on a regular basis. She is most comfortable lying down, spending 70 to 80 percent of her day in that position.

Anderson testified she experiences panic attacks on a daily basis, characterized by shortness of breath and chest wall pain. Her panic attacks last between five minutes to five hours and can be triggered by a variety of things, such as fear or excitement.

### C.   Patricia Greer's Testimony

Patricia Greer, Anderson's personal care assistant, testified on her behalf. She testified that she has known Anderson since they were 15 years old and currently sees her on a daily basis. Greer helps Anderson with almost all daily tasks, including reminding her to take her medication, performing household chores, cooking, grocery shopping, and taking Anderson to doctor's appointments.

Greer testified that Anderson has limited physical abilities. According to Greer, Anderson's difficulties include: grasping objects; ambulating stairs; performing daily household tasks, such as cooking; and taking care of her personal needs. She described Anderson as "weak and tired."

Greer testified that some days she will arrive at Anderson's home and Anderson is so

tired and weak that she is unable to get out of bed. When Anderson does leave the house, Greer testified that she in not able to walk any distance, and must use a mobile chair to ambulate. Greer further described that Anderson suffers from panic attacks at least four times a week with associated shortness of breath, and sweating.

### D. Vocational Expert's Testimony

The Vocational Expert ("VE"), Marianne Lumpe, identified four separate types of past relevant work, including telephone repair person, administrative assistant, accountant, and secretary. The ALJ then asked the vocational expert to assume a hypothetical claimant with the following limitations: capable of sitting, standing, and walking six out of eight hours; capable of lifting 10 pounds frequently and 20 pounds occasionally; no pushing or pulling overhead; no climbing ladders, ropes, or scaffolds; no kneeling, crouching, crawling, or overhead reaching; capable of occasionally climbing stairs and ramps, balancing, and stooping; should not be exposed to temperature extremes, vibrations, or hazards; incapable of understanding and remembering detailed instructions; and capable of dealing with, understanding, remembering, and carrying out simple instructions.

In response to this hypothetical, the VE testified that such a claimant would not be capable of performing any of her past work, but could perform other light and sedentary, unskilled work. The VE testified that a claimant would be capable of light, unskilled jobs including cashier, subassembler electronics, and office helper. She also testified that the sedentary, unskilled jobs would include surveillance system monitor, credit authorizer, and an order clerk. The ALJ then asked the VE to assume another hypothetical where the

claimant would need the ability to lie down and rest occasionally. With this additional restriction, the VE testified that no full-time, competitive work would be available.

On cross-examination, the VE testified that the typical break schedule for the identified jobs is a 15 minute morning and mid-afternoon break and a 30 minute lunch break. She noted that extra breaks are not given on an ongoing basis and if such an accommodation was needed, the claimant would be terminated. The VE testified that one would be allowed eight to ten days of absenteeism per year before employment would be compromised. She further testified that if a claimant is unproductive up to one-third of an eight hour workday, she would not be employable. Finally, the VE testified that of the jobs identified, all but one would require frequent to constant use of the hands.

## II. The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that Anderson was not disabled. At step one of the sequential evaluation process, the ALJ found that Anderson had not engaged in any substantial gainful activity after her amended onset date of October 14, 2004. The ALJ

also found that Anderson had multiple severe impairments including: depression/anxiety; degenerative disc and joint disease in the cervical spine, status post diskectomy and fusion in June 2007 with bone graft and plating; insulin dependent diabetes; asthma with continued smoking; a thyroid disorder; and weight disproportionate to height.

At step three of the sequential evaluation process, the ALJ found that Anderson did not have an impairment or a combination of impairments that met or medically equaled the requirements of any of the listed impairments. The ALJ further found that Anderson's testimony as to the severity of her medical condition was not fully credible. Finally, the ALJ found that although Anderson could not perform any of her past work, she had the residual functional capacity to perform sedentary work for which there are a significant number of jobs.

## III.    Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the

available "zone of choices."  *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at *1 (8th Cir. Oct. 4, 2007).  "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact."  *Id*. (quoting *Nicola*, 480 F.3d at 886).

## IV.    Discussion

Anderson  argues that the ALJ erred by (1) finding that Anderson's impairments did not meet the requirements of listing § 12.04 or 12.06; (2) failing to afford controlling weight to Anderson's treating psychiatrist; and (3) improperly formulating Anderson's RFC.  The Court finds that if the ALJ had given proper controlling weight to Anderson's treating psychiatrist, then Anderson's impairments would have met the requirements of listing § 12.04 or 12.06 and her RFC would have resulted in a finding of disability.  The Court finds that the ALJ's decision was not supported by substantial evidence on the record as a whole because controlling weight was not given to the opinion of Anderson's psychiatrist.  As a result, the Court remands for an award of benefits.  *See Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997) ("Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability.").

At issue in this case is whether a the ALJ gave proper weight to Anderson's treating psychiatrist, Dr. True.  For the purpose of weighing medical evidence in a Social Security disability claim, physicians are divided into three groups: treating physicians, consultative examining physicians, and reviewing physicians.  In this case, there are opinions of a treating physician and two consultive evaluations.

In deciding how much weight to give a treating source opinion, an ALJ first determines whether the opinion qualifies for controlling weight. "Under the SSA's regulations, an ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *See Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

The Commissioner argues in support of the ALJ's opinion that Dr. True's description of marked functional limitations in multiple areas of functioning was inconsistent with other GAF assessments in the record which described Anderson as having moderate functional restrictions. It is true that Anderson has received wide-ranging GAF assessments. A GAF score assessment is an evaluation tool for the current period only, a snapshot or moment in time that indicates a claimant's functioning at the time of the assessment. GAF scores may be relevant evidence, but they can be discounted if inconsistent with other evidence in the record. *See England v. Astrue*, 490 F.3d 1017, 1023 n.8 (8th Cir. 2007) (citing *Hudson ex rel Jones*, 345 F.3d 661, 666 (8th Cir. 2003)).

Following treatment of Anderson for over two years, Dr. True has only assigned Anderson a GAF score over 50 on four occasions, with the highest GAF assigned being a fifty-five. Moreover, after having treated Anderson for two years, in 2008, Dr. True assessed a current GAF of 47 with the highest GAF for the year at 49. The ALJ agrees that if Dr. True's assessment is accurate, Anderson "would have very serious mental limitations." (Tr. 16).

The Commissioner points to examples of GAFs in which physicians have only seen Anderson one time. For example, in May 2004, Rick Zbinden, MSW/LCSW, filled out an intake assessment in which he assigned a current GAF of 57 and a highest GAF for the past year of 62. However, there is no evidence in the record that Zbinden treated Anderson before or after this assessment. And there was no place on the form to indicate Anderson's lowest GAF score for the past year. The ALJ did not take any medical testimony, explaining the significance of the GAF scores in the context of Anderson's case. Using these scores as the main reason to discount the opinion of a specialist who has treated Anderson over two years is improper.

Notwithstanding the GAF scores, the record actually supports Dr. True's assessment that Anderson is not capable of participating in gainful employment. In addition to Dr. True, a vocational counselor and two Medicaid decisions agreed Anderson's mental impairments would cause significant difficulties in her ability to sustain employment.

Dr. True has consistently diagnosed and treated Anderson for major depression and panic disorder. As early as October 2005, Dr. True opined that Anderson was disabled from her thyroid, heart, and emotional illness. He has completed two medical source statements. After two years of treatment, his opinion remained the same when he opined that Anderson would have difficulty working at a job on a sustained basis.

Moreover, in March 2005 a vocational rehabilitation report completed by Counselor Robert Tucker indicated that Anderson's "depression/anxiety along with her difficulty setting boundaries and trouble accepting instructions from authority make it very difficult to

maintain employment." (Tr. 148). Tucker opined that Anderson suffers from a significant disability, noting that her impairments make it very difficult for her to maintain employment.

Additionally, following a December 13, 2005, Medicaid determination hearing, it was found that because of Anderson's physical and mental impairments she would be "incapable of returning to her relevant past work or of engaging in any other substantial gainful activity with her competence considering her age, education, and work experience." (Tr. 145.) A July 5, 2007, hearing established that Anderson's conditions had not improved and she continues "to be permanently and totally disabled." (Tr. 140.) The ALJ failed to even mention these contrary opinions in her decision.

Anderson has a history of panic disorder characterized by daily panic attacks. As early as January 2005, Anderson presented to the emergency room with complaints of severe anxiety attacks, described as feeling like she is having a heart attack. Two months later, following her initial intake at Swope Parkway in 2005, Anderson reported that she feels afraid and detached, and has approximately three panic attacks per day. Furthermore, Anderson has presented to the emergency room on 18 separate occasions with complaints of chest pains. Each time all of the tests came back normal. Anderson even has a personal assistant who comes to her house for 4 hours a day to assist her with her daily needs and to drive her to Anderson's appointments, who confirmed witnessing Anderson's panic attacks.

Contrary to the ALJ's perception, much of the medical evidence is in agreement regarding Anderson's mental impairments. The ALJ did not give the opinion of Anderson's treating psychiatrist the weight to which it was entitled. Giving Dr. True's opinion

controlling weight, the opinions of the two consulting examinations are also properly discounted. The Commissioner argues that these consultive examinations demonstrate Anderson is not disabled, picking and choosing from these records to support the ultimate decision. This analysis is unpersuasive. *See Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989) ("In determining whether the Secretary's decision is supported by substantial evidence on the record as a whole, the court must take into consideration the weight of the evidence in the record both for and against the conclusion reached.").

If the ALJ had given Dr. True's medical source statements controlling weight, she agreed that Anderson had "at least two marked degrees of functional limitations which, if fully credible, would meet a listing level of severity." (Tr. 16). Moreover, the VE testified that with restrictions such as those described in Dr. True's medical source statement, Anderson would be disabled. Accordingly, the Court finds that by giving Dr. True's opinion controlling weight, Anderson would be disabled.

## V.    Conclusion

The ALJ's decision was not supported by substantial evidence. Accordingly, it is hereby

ORDERED that Leslie Anderson's Petition [Doc. # 6] is GRANTED. The decision of the ALJ is REVERSED and the case is REMANDED with instructions to award benefits.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 12, 2010